UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                              )
NATIONAL PARKS CONSERVATION    )
ASSOCIATION, et al.,           )
                              )
            Plaintiffs,        )
                              )
            v.                 )        Civil Action No. 12-1690 (RWR)
                              )
SALLY JEWELL,[1] et al.,       )
                              )
            Defendants.        )
_____)
```

MEMORANDUM OPINION

The National Parks Conservation Association and nine other organizations[2] brought this suit against the Secretary of the Interior and the Northeast Regional Director of the U.S. National Park Service ("NPS") challenging NPS' decision to grant special use permits and an extended right-of-way for the construction of the Susquehanna to Roseland Transmission Line ("S-R Line") through three national park areas -- the Delaware Water Gap National Recreation Area, the Middle Delaware National Scenic and Recreational River, and the Appalachian National Scenic Trail

---

[1] Under Federal Rule of Civil Procedure 25(d), current Secretary of the Interior Sally Jewell is automatically substituted for former Secretary Kenneth Salazar.

[2] The other plaintiff organizations include the Appalachian Mountain Club, Appalachian Trail Conservancy, Association of New Jersey Environmental Commissions, Delaware Riverkeeper Network, New Jersey Highlands Coalition, New York-New Jersey Trail Conference, Rock the Earth, Sierra Club and Stop the Lines.

(collectively, "the Parks"). PPL Electric Utilities Corporation and Public Service Electric and Gas Company, the utilities companies that applied to NPS to build the S-R Line, intervened in this matter. Plaintiffs moved for summary judgment arguing that the NPS failed to properly review the environmental consequences of the S-R Line project in the environmental impact statement ("EIS"), in violation of the National Environmental Protection Act ("NEPA"), 42 U.S.C. § 4321 et seq., and that NPS unlawfully decided to grant the special use permits and an extended right-of-way, in violation of the NPS Organic Act, 16 U.S.C. § 1 et seq. and the Wild and Scenic Rivers Act ("WSRA"), 16 U.S.C. § 1271 et seq. The federal defendants and the intervenor defendant utilities companies cross-moved for summary judgment. Because NPS' actions were not arbitrary and capricious, the plaintiffs' motion for summary judgment will be denied and the defendants' cross-motions for summary judgment will be granted.[3]

## BACKGROUND

The intervenor-defendants own a right-of-way through the Parks upon which the current 230 kilovolt ("kV") Bushkill-to-

---

[3] The federal defendants also move to strike the declaration of Pamela Underhill and all references to the declaration in the plaintiffs' summary judgment reply brief. Because the summary judgment motions will be decided without consideration of the Underhill declaration, the federal defendants' motion to strike will be denied as moot. Moreover, the plaintiffs' motion for a preliminary injunction will be denied as moot.

Kittatinny transmission line ("B-K Line") stands.  Compl. ¶ 44;
Pls.' Mem. of Law in Supp. of Mot. for Summ. J. ("Pls.' Mem.") at
7; Def.-Intervenors' Mem. of P. & A. in Opp'n to Pls.' Mot. for
Summ. J. and in Supp. of Def.-Intervenors' Cross-Mot. for Summ.
J. ("Intervenor Defs.' Mem.") at 7; Mem. in Supp. of Fed. Defs.'
Cross-Mot. for Summ. J. and Opp'n to Pls.' Mot. for Summ. J.
("Federal Defs.' Mem.") at 2.  In 2007, PJM Interconnection, LLC,
("PJM"), which oversees the electrical transmission system in the
region, identified electric grid reliability violations with the
B-K Line.  Intervenor Defs.' Mem. at 5; Federal Defs.' Mem. at 2;
AR 73982, 78554.  PJM decided that a 500-kV electric transmission
line was the preferred solution for the reliability violations
which had been identified.  NPS Susquehanna to Roseland 500kV
Transmission Line Right-of-Way and Special Use Permit Final
Environmental Impact Statement ("FEIS") at 4 (AR 47865);
AR 73982.  The intervenor defendants applied to NPS for a special
use permit to allow for "construction, maintenance and operation
of the S-R Line across [the Parks], the expansion of the existing
[right-of-way], and the replacement of an existing 230-kV
transmission line it owns."  FEIS at 4 (AR 47865); see also NPS
Susquehanna to Roseland 500-kV Transmission Line Right-of-Way and
Special Use Permit, Record of Decision ("ROD") at 1 (AR 116587);
Compl. ¶ 53.  The proposed S-R Line would replace the existing
B-K Line and include larger towers, an additional circuit, and a

widened right-of-way to accommodate the changes.  Compl. ¶ 53;
FEIS at 4 (AR 47865); ROD at 1 (AR 116587).

NPS conducted an environmental review and published a Draft
Environmental Impact Statement ("DEIS") in 2011 that identified
various alternative routes for building a replacement
transmission line, identified mitigation measures, and discussed
the environmental consequences of each alternative. See Federal
Defs.' Mem. at 8; Intervenor Defs.' Mem. at 11; ROD at 21
(AR 116607).  In January 2012, the applicants proposed a
methodology for compensatory mitigation and estimated that
$36,494,241 should be provided in compensatory mitigation for the
project in their comments to the DEIS.  AR 78239-48.  After the
public comment period closed, NPS issued the Final Environmental
Impact Statement ("FEIS") and identified NPS' preferred
alternative as the applicant's proposed route.  FEIS at vii
(AR 47840); Federal Defs.' Mem. at 5.  NPS then issued the Record
of Decision ("ROD") in October 2012 that granted the utilities
companies' request for special use permits and an expanded right-
of-way for the construction of the S-R Line.  Pls.' Mem. at 26;
Intervenor Defs.' Mem. at 13; Federal Defs.' Mem. at 6-7; ROD at
1-30 (AR 116586-616).  In December 2012, NPS issued the special
use permits to the utilities company for the project, and the
utilities companies and the federal defendants entered into a
Memorandum of Agreement that set forth details about the

compensatory mitigation measures and established the Middle Delaware Mitigation Fund ("the Fund"). Intervenor Defs.' Mem. at 16-17; Federal Defs.' Mem. at 7; see Federal Defs.' Opp'n to Pls.' Mot. for a Prelim. Inj., Ex. B, Memorandum of Agreement.

## DISCUSSION

Summary judgment may be granted on a claim if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> In a case involving review of a final agency action under the APA, however, the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record. . . . "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." . . . Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.

Center for Food Safety v. Salazar, 898 F. Supp. 2d 130, 138 (D.D.C. 2012) (quoting Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006)); see also Flaherty v. Bryson, 850 F. Supp. 2d 38, 47 (D.D.C. 2012) ("Because this case involves a challenge to a final administrative decision, the Court's review on summary judgment is limited to the Administrative Record.").

The complaint asserts eleven causes of action including eight[4] NEPA claims, one NPS Organic Act claim, and two WSRA

---

[4] The complaint asserts that NPS violated NEPA by failing to consider all reasonable alternatives for the S-R Line project in

claims.  See Compl. at 33-41.  Review of final agency actions

under these statutes is governed by the arbitrary and capricious

standard of the Administrative Procedure Act ("APA"), 5 U.S.C.

§§ 701-706.  See Nevada v. Dep't of Energy, 457 F.3d 78, 87 (D.C.

Cir. 2006) (stating that courts "apply the APA's arbitrary and

capricious standard to a NEPA challenge"); Daingerfield Island

Protective Soc'y v. Babbitt, 40 F.3d 442, 446 (D.C. Cir. 1994)

(finding that the NPS' exercise of discretion under the NPS

Organic Act must be upheld unless it violated the APA's arbitrary

and capricious standard); Hells Canyon Alliance v. U.S. Forest

Serv., 227 F.3d 1170, 1176-77 (9th Cir. 2000) (stating that

review of the WSRA is governed by the APA).  "Generally, '[t]he

───────────────

Count Four, failing to consider and disclose all direct and
indirect effects of the S-R Line project in Counts Five and Six,
failing to consider and disclose a connected action in Count
Seven, failing to consider cumulative impacts of the S-R Line
project in Count Eight, failing to consider and disclose
mitigation measures in Count Nine, failing to prepare a
supplemental EIS in Count Ten, and prejudging and approving the
selected alternative in Count Eleven.  However, the plaintiffs'
summary judgment memorandum asserts arguments directed at claims
in Counts Four, Five, Six, Nine, and Ten.  The plaintiffs'
summary judgment memorandum does not address directly Count Seven
or Count Eight, but their arguments supporting Counts Five and
Six regarding the scope of the agency's review appear to involve
the claims in Counts Seven and Eight.  In addition, the
plaintiffs' arguments supporting Count Eleven's claim of
prejudgment are based on the plaintiffs' arguments regarding
mitigation measures.  See Pls.' Mem. at 15-17.  The plaintiffs'
claim in Count Eleven, then, depends on the resolution of their
claims in Count Nine.  Counts Nine and Eleven will be addressed
in Section I.A., Count Ten will be addressed in Section I.B.,
Count Four will be addressed in Section I.C., and Counts Five to
Eight will be addressed in Section I.D. below.

scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.'" Pettiford v. Sec'y of Navy, 774 F. Supp. 2d 173, 181 (D.D.C. 2011) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). "However, this deferential standard cannot permit courts 'merely to rubber stamp agency actions,' . . . nor be used to shield the agency's decision from undergoing a 'thorough, probing, in-depth review.'" Flaherty, 850 F. Supp. 2d at 47 (quoting NRDC v. Daley, 209 F.3d 747, 755 (D.C. Cir. 2000); Midtec Paper Corp. v. United States, 857 F.2d 1487, 1499 (D.C. Cir. 1988)). "Courts 'will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" Public Citizen, Inc. v. FAA, 988 F.2d 186, 197 (D.C. Cir. 1993) (quoting Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)).

I.   NATIONAL ENVIRONMENTAL PROTECTION ACT

"NEPA 'requires that agencies assess the environmental consequences of federal projects by following certain procedures during the decision-making process.'" Brady Campaign to Prevent Gun Violence v. Salazar, 612 F. Supp. 2d 1, 13 (D.D.C. 2009) (quoting City of Alexandria, Va. v. Slater, 198 F.3d 862, 866 (D.C. Cir. 1999)). "[T]he twofold purpose of NEPA [is] to ensure that a federal agency considers environmental consequences in making its decision and to inform the public that the agency has

done so." <u>Wilderness Soc'y v. Salazar</u>, 603 F. Supp. 2d 52, 65-66 (D.D.C. 2009) (citing <u>Weinberger v. Catholic Action of Hawaii/Peace Educ. Project</u>, 454 U.S. 139, 143 (1981)); <u>see also</u> <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 349 (1989).

        A.    <u>Mitigation measures</u>

        NEPA requires a federal agency to prepare an EIS for "'major Federal actions significantly affecting the quality of the human environment.'" <u>Duncan's Point Lot Owners Ass'n v. Fed. Energy Regulatory Comm'n</u>, 522 F.3d 371, 376 (D.C. Cir. 2008) (quoting 42 U.S.C. § 4332(2)(C)).  One of the purposes of the EIS is to "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public."  40 C.F.R. § 1502.14.  The regulations of the Council on Environmental Quality[5] ("CEQ") state that an EIS must "[i]nclude appropriate mitigation measures not already included in the proposed action or alternatives[,]" 40 C.F.R. § 1502.14(f), and

_____

        [5] The CEQ was established by NEPA and has promulgated regulations interpreting NEPA's requirements.  The D.C. Circuit has recognized that "'the binding effect of CEQ regulations is far from clear,'" Nevada v. Dep't of Energy, 457 F.3d 78, 87 n.5 (D.C. Cir. 2006) (quoting TOMAC v. Norton, 433 F.3d 852, 861 (D.C. Cir. 2006)), but "both agencies and courts have consistently looked to them for guidance[,]" Flaherty, 850 F. Supp. 2d at 69 n.19 (citing, among others, Sierra Club v. Van Antwerp, 661 F.3d 1147, 1154-55 (D.C. Cir. 2011)).

discuss "means to mitigate adverse environmental impacts[,]" 40 C.F.R. § 1502.16(h).[6]

"[O]ne important ingredient of an [environmental impact statement] is the discussion of steps that can be taken to mitigate adverse environmental consequences." Robertson, 490 U.S. at 351. Robertson explained that without a discussion about mitigation measures, "neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects." Id. at 352. However, NEPA does not "demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act" or a "detailed explanation of specific measures which *will* be employed to mitigate the adverse impacts of a proposed action[.]" Id. at 353. Instead, an agency's discussion of potential mitigation measures in an EIS must include "sufficient detail to ensure that environmental consequences have been fairly evaluated." Theodore

---

[6] The CEQ regulations state that
Mitigation includes:
    (a) Avoiding the impact altogether by not taking a certain action or parts of an action.
    (b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.
    (c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.
    (d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.
    (e) Compensating for the impact by replacing or providing substitute resources or environments.
40 C.F.R. § 1508.20.

Roosevelt Conservation P'ship v. Salazar, 616 F.3d 497, 503 (D.C.
Cir. 2010) (quoting Robertson, 490 U.S. at 352).  "NEPA 'does not
require agencies to discuss any particular mitigation plans that
they might put in place,' nor does it 'require agencies –- or
third parties –- to effect any.'"  Id. (quoting Citizens Against
Burlington, Inc., v. Busey, 938 F.2d 190, 206 (D.C. Cir. 1991)).
After preparing a draft EIS, an agency must "[r]equest comments
from the public, affirmatively soliciting comments from those
persons or organizations who may be interested or affected."  40
C.F.R. § 1503.1(a)(4).

    "'The court's role is to ensure that the agency takes a
'hard look' at the environmental consequences of an action, not
to interject its own judgment as to the course of action to be
taken.'"  Wilderness Soc'y, 603 F. Supp. 2d at 59  (quoting
Hammond v. Norton, 370 F. Supp. 2d 226, 240 (D.D.C. 2005)).  "If
the adverse environmental effects of the proposed action are
adequately identified and evaluated, the agency is not
constrained by NEPA from deciding that other values outweigh the
environmental costs."  Robertson, 490 U.S. at 350.

    Plaintiffs argue that NPS' discussion of mitigation measures
in the EIS is deficient for two reasons.  First, plaintiffs argue
that NPS did not take a "hard look" at the environmental
consequences because the FEIS included only general mitigation
measures that do not include the contents of the mitigation

plans, and did not provide "supporting analytical data" about the mitigation measures or assessments about the actual mitigating effects of the plans. Pls.' Mem. at 42-43. Second, plaintiffs contend that NPS failed to analyze in the EIS the compensatory mitigation measures. Id. at 39-40. Thus, the public never had an opportunity to evaluate the compensatory mitigation measures and assess the merits of the Fund, including what land would be acquired and how the agency decided that the compensatory mitigation would mitigate the environmental harm arising from the project. Id.; Pls.' Reply at 33-35.

An EIS is not required to contain "detailed, uncheangeable mitigation plans for long-term development projects." Theodore Roosevelt Conservation P'ship, 616 F.3d at 517. In Theodore Roosevelt, the D.C. Circuit considered whether the Bureau of Land Management ("BLM") satisfied NEPA's requirement to include mitigation measures when it issued an EIS before authorizing drilling permits in Wyoming. The EIS included several specific mitigation measures to protect wildlife and plants, including limitations on building structures near the greater sage grouse's habitat and muffling generator noises to avoid disturbances. Theodore Roosevelt, 616 F.3d at 516. The mitigation plan also discussed performance goals which the agency would strive to accomplish, included flexible monitoring and protection measures which the BLM could modify, and relied on a "review team" which

would develop specific criteria to evaluate adherence to those goals.  Id.  In addition, the mitigation plan included particular protective measures which should be applied for each drill plan but recognized that the "exact application of mitigation measures will be determined on a site-specific basis[.]"  Id.  The D.C. Circuit reviewed whether the EIS was sufficient and held that NEPA's mandate to discuss mitigation measures was met because the agency "set[] forth both fixed mitigation measures and an adaptive management plan[.]"  Id. at 517.

In this case, the FEIS discusses potential mitigation measures and their effectiveness.  See FEIS at 386 (AR 48247) (wetlands), 431 (AR 48292) (landscape connectivity), 463-64 (AR 48324-25) (special status species).  Appendix F of the FEIS sets forth a wide range of potential mitigation measures and plans covering impacts to the Parks' resources.  See FEIS, App. F (AR 48920-45).  For example, NPS requires the applicants to submit specific mitigation plans (i.e., drilling plans, spill prevention and response plan, soil and erosion control plans, vegetation management plans, etc.) for NPS review and approval, identified the goals and procedures to be implemented by the applicants' plans, discussed particular materials to be used in construction, and asserted a variety of other mitigation measures.  Id. Because the FEIS in this case sets forth both "fixed mitigation measures" and "adaptive management plan[s]" in the EIS similar to

those upheld in <u>Theodore Roosevelt</u>, NPS did not violate NEPA's
mandate to discuss possible mitigation measures.

The plaintiffs' argument regarding compensatory mitigation
also fails because the plaintiff has not shown that the agency's
analysis in the EIS was insufficient.  The FEIS states that

> [i]n instances where impacts cannot be avoided and
> mitigation is not feasible, compensation for resources
> lost or degraded through project construction,
> operation, and maintenance would be required.  . . .
> Compensation would be used to help ensure the
> stewardship of natural, cultural, scenic, and
> recreational resources, thus allowing for [among other
> uses] . . . acquisition in fee or easement of lands
> within or adjacent to [the Appalachain National Scenic
> Trail] and [the Delaware Water Gap National Recreation
> Area] . . . [and] implementation of the parks' existing
> natural, historic, and recreational plans[.]

FEIS at 72-73 (AR 47933-34).  The FEIS further states that "[t]he
preferred alternative also includes mitigation in the form of
compensation for unavoidable adverse impacts.  . . .
Compensation would only be considered for adverse impacts that
cannot be completely avoided."  FEIS at 75 (AR 47936).  The
discussion in the FEIS reflects that the environmental
consequences of the construction of the S-R Line were identified
and compensation was considered as a part of the multi-component
mitigation plan.  For example, the FEIS discussed a specific
feature of the compensatory mitigation when it referred to the
requirement that "for new actions where impacts on wetlands
cannot be avoided, proposals must include plans for compensatory
mitigation that restores wetlands on NPS lands at a minimum

acreage ratio of 1 to 1 for the preferred alternative." FEIS at 386 (AR 48247). This level of detail comports with NEPA requirements.

These circumstances are similar to those in <u>Busey</u>. In that case, the FAA issued an EIS that set forth a general plan regarding mitigation efforts to blunt the effects of a significant increase of noise from an expanded airport. <u>Busey</u>, 938 F.2d at 205. There, the EIS discussed mitigation measures that included buying property from owners of nearby locations, insulating doors and windows of nearby homes and buying easements from other home owners; estimated the cost of such measures; and explained that a future study will "flesh out the details of the mitigation plans." <u>Id.</u> The plaintiffs in that case "want[ed] the specifics *now*; . . . [and] demand[ed] that the FAA finish its . . . study before the agency be allowed to approve the . . . proposal." <u>Id.</u> at 206. The D.C. Circuit found that the plaintiffs sought more information in the EIS than NEPA required and that the EIS in <u>Busey</u> was reasonably complete even though the study that would have provided details for the mitigation plans had not been completed.

Here, the plaintiffs also want the specifics of compensatory mitigation measures *now*, but the FEIS was required to provide only "a reasonably complete discussion of potential mitigation measures." <u>See</u> <u>Busey</u>, 938 F.2d at 206 (quoting <u>Robertson</u>, 490

U.S. at 352). The plaintiffs note correctly that the FEIS did
not provide an estimate of the compensatory mitigation amount.
However, the administrative record reflects that the amount of
potential compensatory mitigation varied significantly even after
the FEIS was issued. For example, the January 2012 applicants'
proposal in their comments to the DEIS was $36 million, AR 78246-
47, the July 2012 net environmental benefit analysis prepared by
an NPS contractor was $89 million, AR 58377, a September 2012 NPS
internal draft memorandum reflects the total amount of $62
million, AR 73356-57, the October 2012 ROD required at least $56
million, ROD at 15 (AR 116601), and the Memorandum of Agreement
creating the Fund required the applicants to deposit $66 million
in the Fund, Mem. of Agreement at 2. Although an estimate could
have been provided by NPS at the EIS stage, the plaintiffs were
aware of the applicants' proposed methodology and suggested
compensation amount that was included in the DEIS comments, AR
78239-48, and appended to the FEIS for informational purposes,
FEIS, App. N (AR 49830-50045). The plaintiffs have not shown
that the omission of NPS' own compensatory mitigation estimate in
the FEIS pending negotiations with the applicants to flesh out
the full economic value of the compensatory mitigation
constitutes a NEPA violation. In particular, the plaintiffs have
not shown how the omission of this figure undermines the FEIS'
detailed analysis of the environmental consequences of the agency

action.  The general mitigation plans included in the FEIS were
"reasonably complete" because it included "sufficient detail to
ensure that environmental consequences have been fairly
evaluated[.]"  Robertson, 490 at 352.  Because the plaintiffs
have not shown that NPS did not take a "hard look" at the
environmental consequences of the agency action or that the
agency failed to include mitigation measures as required by the
CEQ regulations, the defendants are entitled to summary judgment
on this claim.

    B.   Supplemental EIS

    The plaintiffs argue that NPS violated NEPA when NPS did not
prepare a supplemental EIS when NPS and the applicants reached an
agreement that the applicants would deposit $66 million in the
Fund.  Pls.' Mem. at 40-41.  A supplemental EIS is required when
"[t]here are significant new circumstances or information
relevant to environmental concerns and bearing on the proposed
action or its impacts."  40 C.F.R. § 1502.9(c)(1)(ii).  "A
supplemental EIS is only required where new information provides
a *seriously* different picture of the environmental landscape."
City of Olmsted Falls, Ohio v. FAA, 292 F.3d 261, 274 (D.C. Cir.
2002) (internal quotation marks omitted); see also Blue Ridge
Envtl. Def. League v. Nuclear Regulatory Comm'n, 716 F.3d 183,
196 (D.C. Cir. 2013) ("New and significant information presents a
seriously different picture of the environmental impact of the

proposed project from what was previously envisioned." (internal quotation marks omitted)). "[W]hether a change is 'substantial' so as to warrant [a supplemental EIS] is determined not by the modification in the abstract, but rather by the significance of the environmental effects of the changes." <u>Pub. Emps. for Envtl. Responsibility v. U.S. Dep't of the Interior</u>, 832 F. Supp. 2d 5, 29-30 (D.D.C. 2011).

The CEQ regulations reflect that "[a] significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." 40 C.F.R. § 1508.27(b)(1).

> [E]ven if post-EIS changes in a project are *beneficial* to the environment or are intended to mitigate environmental impact, if those changes are significant, a supplemental statement is required:
>> The proper question is not the intent behind the actions, but the significance of the environmental impacts. And even if . . . the new land use will be beneficial in impact, a beneficial impact must nevertheless be discussed in an EIS, so long as it is significant. NEPA is concerned with all significant environmental effects, not merely adverse ones.

<u>National Wildlife Fed'n v. Marsh</u>, 721 F.2d 767, 782-83 (11th Cir. 1983) (quoting <u>Envtl. Def. Fund v. Marsh</u>, 651 F.2d 983, 993 (5th Cir. 1981)); <u>but see</u> <u>Alliance to Save the Mattaponi v. U.S. Army Corps of Eng'rs</u>, 606 F. Supp. 2d 121, 137 (D.D.C. 2009) ("When a change reduces the environmental effects of an action, a supplemental EIS is not required."). However, supplementation of an EIS is not necessary when the mitigation measure is within the scope of the EIS's discussion of mitigation measures or is a

minor variation from it.  See Sierra Club v. Van Antwerp, 526
F.3d 1353, 1360 (11th Cir. 2008) (finding that where a proposed
action is a "minimizing measure," the agency does not need to
supplement the EIS because "a minimizing measure's effects on the
environment will usually fall within the scope of the original
NEPA analysis"); see also Russell Country Sportsmen v. United
States Forest Serv., 668 F.3d 1037, 1045 (9th Cir. 2011) ("[A]
modified alternative [that] only lessens environmental impacts
may tend to show that the new alternative is a 'minor variation
of one of the alternatives discussed in the draft EIS' and is
'qualitatively within the spectrum of alternatives that were
discussed in the draft [EIS].'" (quoting Forty Most Asked
Questions Concerning CEQ's National Environmental Policy Act
Regulations, 46 Fed. Reg. 18,026, 18,035 (Mar. 23, 1981)).
Therefore, new information that provides *significant* beneficial
environmental effects triggers the supplemental EIS requirement,
but new information which results in environmental effects that
are within the scope of the EIS' analysis do not require
supplementation.

        "The decision to undertake a supplemental EIS is subject to
a 'rule of reason.'"  City of Olmsted Falls, Ohio, 292 F.3d at
274 (quoting Marsh v. Or. Natural Res. Council, 490 U.S. 360, 374
(1989)).

            Application of the "rule of reason" . . . turns on the
            value of the new information to the still pending

decisionmaking process.  In this respect the decision
whether to prepare a supplemental EIS is similar to the
decision whether to prepare an EIS in the first
instance: If there remains "major Federal actio[n]" to
occur, and if the new information is sufficient to show
that the remaining action will "affec[t] the quality of
the human environment" in a significant manner or to a
significant extent not already considered, a
supplemental EIS must be prepared.

Or. Natural Res. Council, 490 U.S. at 374; see also Nat'l Comm.

for the New River v. Fed. Energy Regulatory Comm'n, 373 F.3d

1323, 1330 (D.C. Cir. 2004).[7]  An agency's decision whether to

prepare a supplemental EIS is entitled to deference under the

arbitrary and capricious standard.  Nat'l Comm. for the New

River, 373 F.3d at 1330 (citing Or. Natural Res. Council, 490

U.S. at 375-76); City of Olmsted Falls, Ohio, 292 F.3d at 274.

---

[7] The significance of the impacts depends on the "context"
and "intensity" of the impacts as defined by the CEQ regulations.
Or. Natural Res. Council, 490 U.S. at 374 n.20.  The CEQ
regulations state:

    (a) Context.  This means that the significance of an
    action must be analyzed in several contexts such as
    society as a whole (human, national), the affected
    region, the affected interests, and the locality.
    Significance varies with the setting of the proposed
    action.  . . .
    (b) Intensity.  This refers to the severity of impact.
    Responsible officials must bear in mind that more than
    one agency may make decisions about partial aspects of
    a major action.  The following should be considered in
    evaluating intensity:
        (1) Impacts that may be both beneficial and
        adverse.  A significant effect may exist even if
        the Federal agency believes that on balance the
        effect will be beneficial.  . . .

40 C.F.R. § 1508.27.

Here, the plaintiffs assert that the new information identified in the ROD -- the amount of money that the applicants must place in the Fund -- is significant enough to necessitate a supplemental EIS.  Pls.' Mem. at 40-41.  Specifically, "[t]he expenditure of $66 million to undertake land acquisitions and to implement stewardship activities in and around the Parks will have significant environmental impacts that have not yet been considered under NEPA, and an SEIS is required accordingly."  Pls.' Reply at 35.  The federal defendants argue that no supplemental EIS is required because the amount of compensatory mitigation does not change the environmental consequences that were identified and addressed by the FEIS.  Federal Defs.' Mem. at 38-39; Federal Defs.' Reply at 17-20.  Overall, the federal defendants argue that "[a]lthough the details and final figure would change as a result of NPS' independent assessment and computations," the FEIS was sufficient by disclosing the adverse impacts and acknowledging that cash compensation would be used to obtain other lands.  Federal Defs.' Reply at 19-20.

The plaintiffs have not met their burden of showing that the new information is significant enough to require NPS to prepare a supplemental EIS.  The amount of compensatory mitigation and the details about the Fund revealed by the ROD and the Memorandum of Agreement do not change the assessment of adverse environmental consequences of the action addressed in the FEIS.  The

applicant's comments to the DEIS provided the utilities
companies' methodology for arriving at the compensatory
mitigation figure, including the specific per acre value.  The
plaintiffs point to no authority that reflects that the change in
potential mitigation funds from the applicants' proposed figure
of $36,494,241 to the Memorandum of Agreement's figure of $66
million is significant or that this increase in compensatory
mitigation substantially changes the beneficial environmental
consequences of the action.  The FEIS includes compensatory
mitigation as a part of the mitigation plan and the plaintiffs
have not shown how the new information, the precise amount of
compensation, represents a major variation from or was
qualitatively different than the discussion of compensatory
mitigation in the FEIS.

Although NPS could have provided its own independent
analysis and methodology for identifying the corresponding
monetary value between the compensatory mitigation measures and
the adverse impacts in the FEIS, the plaintiffs have not shown
that NPS was required to do so.  Thus, NPS' decision to not
prepare a supplement regarding compensatory mitigation is
entitled to deference and the plaintiffs have not shown that the
NPS acted arbitrarily and capriciously when it failed to
supplement the FEIS after determining the final amount of
compensatory mitigation.

C.  Scope of alternatives

The plaintiffs also argue that NPS did not consider a reasonable range of alternatives in the EIS to the approval of the special use permits and expanded right-of-way for the S-R Line project.  Pls.' Mem. at 43-44.  In particular, the plaintiffs assert that NPS failed to consider non-transmission alternatives such as "[t]he use of distributed energy generation sites and localized renewable energy[.]"  Id. at 44.  Under NEPA, agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."  40 C.F.R. § 1502.14(a).  "[A]n agency bears the responsibility for deciding which alternatives to consider in an [EIS]."  Busey, 938 F.2d at 195.  An agency must follow the "rule of reason" which governs "both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them" and the CEQ regulations require an agency to "discuss only alternatives that are feasible, or (much the same thing) reasonable."  Id. (internal quotation marks omitted).  Courts should "uphold [the agency's] discussion of alternatives so long as the alternatives are reasonable and the agency discusses them in reasonable detail."  Id. at 196.  The "agenc[y] must look hard at the factors relevant to the definition of purpose" and when asked to approve a specific plan, "the agency

should take into account the needs and goals of the parties involved in the application." Id. Busey further explained that "[a]n agency cannot redefine the goals of the proposal that arouses the call for action; it must evaluate alternative ways of achieving *its* goals, shaped by the application at issue and by the function that the agency plays in the decisional process." Id. at 199. "The goals of an action delimit the universe of the action's reasonable alternatives." Id. at 195. The CEQ regulations require that the "reasonable alternatives" in an EIS must include the alternative of taking no action. 40 C.F.R. § 1502.14.

In Hammond v. Norton, 370 F. Supp. 2d 226 (D.D.C. 2005), the Bureau of Land Management approved the construction of a petroleum pipeline. There, the FEIS discussed the no action alternative to building the pipeline briefly, stating that there was a need for additional petroleum products, identifying the annual deficits in petroleum if the pipeline were not built and concluding that the purpose and need of the application would not be met if the no action alternative were selected. Id. at 241-42. The court found that "this discussion, while brief, lays out the costs and benefits of the no action alternative with enough specificity to allow meaningful comparison with other alternatives. No more is required." Id. at 242.

In this case, the NPS discussed the purpose of the action as "deciding whether to issue the applicant the permits it needs to construct a double-circuit 500-kV transmission line across three units of the national park system." FEIS at i (AR 47834). In addition, the NPS explained that the need to replace the current B-K line with the new S-R Line arose from "grid reliability criteria violations" identified by PJM and was based on the approvals of Pennsylvania Public Utility Commission and New Jersey Board of Public Utilities. Id. at iv-v (AR 47837-38). NPS identified the no action alternative as denying the utilities companies' application to build the S-R Line, id. at v (AR 47838). The proposal that "arouse[d] the call to action" was the utilities companies' request for a special use permit and expanded right-of-way to replace the current transmission line with the larger S-R Line. The FEIS states that the application was "driven by a need for transmission capacity." Id. at 71 (AR 47932). Further, NPS specifically considered, among other alternatives, the use of "distributed energy generation sites and localized renewable energy[,]" and decided that this alternative did "not meet the purpose and need for federal action or that of the applicant." Id.

Here, NPS followed NEPA's requirements by considering the range of alternatives flowing from the proposal's purpose, including consideration of the application's method of achieving

the goals and alternative methods.  In particular, the no action
alternative is considered and dismissed in the FEIS and ROD.  See
FEIS at 35 (AR 47896); ROD at 15-16, 18 (AR 116601-02, 116604).
The agency decided that the alternatives would not meet the
applicants' goals and that it was likely that the applicants
would attempt to unilaterally replace the B-K Line within the
current right-of-way if the NPS denied the application.  Even if
plaintiffs disagree with NPS' analysis, the plaintiffs have not
shown that NPS violated NEPA by failing to review alternatives
which were raised, discussed and rationally rejected in the FEIS.

    D.  Scope of environmental impacts

    The plaintiffs also argue that the agency did not take a
"hard look" at the full scope of the project's environmental
impacts.  Pls.' Mem. at 44-45.  NPS recognized that the utilities
companies could determine the route of the S-R Line outside of
the boundaries of the Parks.  Thus, NPS identified Visual Split
Location ("VSL") points which refer to "[t]he geographical point
outside the parks at which it becomes physically possible for the
applicant to route the line as it sees fit."  FEIS at 33 (AR
47894).  "The determination of the VSLs is important because
while NPS can require the applicant to follow a specific route
inside the VSLs, the NPS cannot require the applicant to follow a
certain route beyond these points."  Id. at 34 (AR 47895).
Therefore, NPS limited its review to the area between the VSLs

for each alternative.  Id. at 33-34 (AR 47894-95).  Plaintiffs
argue that NPS did not consider the impact of construction of the
S-R Line on the viewshed of another national park unit: Steamtown
National Historic Site in Pennsylvania and that "the agency's
narrowly delimited review failed to consider the full scope of
harm that construction of the length of the S-R Line might
inflict on resources and values within the Delaware Water Gap[.]"
Pls.' Mem. at 44-45.

An agency's decision about the appropriate scope of the FEIS
is entitled to deference.  See Kleppe v. Sierra Club, 427 U.S.
390, 414 (1976) (finding that the "determination of the extent
and effect of these [cumulative environmental impacts], and
particularly identification of the geographic area within which
they may occur, is a task assigned to the special competency of
the appropriate agencies").  As is stated above, an agency's NEPA
review is limited to major Federal actions which "includ[e]
actions with effects that may be major and which are potentially
subject to Federal control and responsibility."  40 C.F.R.
1508.18.  "'Effects' is defined to 'include: (a) Direct effects,
which are caused by the action and occur at the same time and
place,' and '(b) Indirect effects, which are caused by the action
and are later in time or farther removed in distance, but are
still reasonably foreseeable.'"  Dep't of Transp. v. Public
Citizen, 541 U.S. 752, 764 (2004) (quoting 40 C.F.R. 1508.8).

"NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause."  Id. at 767 (quoting Metro. Edison Co. v. People Against Nuclear Energy, 460 U.S. 766, 774 (1983)).  A reasonably close causal relationship is similar to the requirement of proximate causation in tort law.  Id. (citing Metro. Edison Co., 460 U.S. at 774).  To determine whether an agency must consider a particular effect, courts must "look to the underlying policies or legislative intent in order to draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not."  Metro. Edison Co., 460 U.S. at 774 n.7; see also Dep't of Transp., 541 U.S. at 768.

The plaintiffs rely on Sierra Club v. Mainella, 459 F. Supp. 2d 76 (D.D.C. 2006).  In that case, the court considered the impact of directional drilling on land outside of a national preserve to extract oil and gas from beneath the preserve.  Mainella, 459 F. Supp. 2d at 79.  Mainella found that the NPS' decision to allow directional drilling operations under the preserve violated NEPA because the NPS failed to evaluate the environmental effects from the surface activities of the directional drilling that occurred outside of the preserve.  Id. at 105-06.  Mainella reasoned that

> it makes sense for NPS to assess the impacts from
> surface activities because there is a reasonably close
> causal relationship between such impacts and NPS's
> decision to grant an operator access to oil and gas

> beneath the Preserve pursuant to an exemption from the
> 9B regulations.  The surface drilling activities are
> functionally inseparable from the downhole drilling
> activities, which may not take place until NPS grants
> the operator access through the Preserve, either
> pursuant to a 9B plan of operations or by an exemption
> from that requirement under section 9.32(e).

Id. at 105.  Therefore, "NEPA requires NPS to evaluate impacts on

the Preserve from adjacent surface drilling activities[.]"  Id.

at 105-06.

The plaintiffs assert that <u>Mainella</u> requires the agency to

look beyond the Parks' boundaries to assess other indirect

effects of the S-R Line based on the "'reasonably close causal

relationship' between the agency's grant of right-of-way and

special use permits and the siting of the S-R Line on either side

of the Park."  Pls.' Reply at 38.  Here, the challenged agency

action was not NPS' approval of the entire S-R Line.  Instead,

NPS decided to grant the applicants an extended right-of-way and

special use permits to construct the S-R Line through the Parks.

ROD at 2 (AR 116588).  Thus, the environmental consequences of

the entire S-R Line were not at issue before the agency in

creating the EIS.  Instead, the agency's review was limited to

the portion of the S-R Line through the Parks and any

environmental effects caused by the construction in the Parks.

To satisfy NPS' duty to consider the environmental effects of the

S-R Line construction on areas outside of the Parks, NPS

rationally used the VSLs to limit the area of study to the area

where NPS controlled the utilities companies' decision to
construct the S-R Line along a particular route.

However, NPS had an obligation to assess any environmental
effects that had a reasonably close causal relationship to the
agency action allowing construction through the Parks.  This
situation is dissimilar from the circumstances in Mainella
because the plaintiffs have not shown how construction of the S-R
Line outside of the Parks is functionally inseparable from any
activities inside of the Parks that NPS must regulate.  If the
plaintiffs' arguments are limited to the construction of the S-R
Line immediately outside of the Parks, the plaintiffs have not
explained why the agency's use of VSL points was insufficient to
satisfy NEPA's requirements for assessing environmental impacts
outside of the Parks.  The plaintiffs do not identify any
environmental effects arising from the S-R Line's construction
similar to the directional drilling that occurred in Mainella.

The plaintiffs argue that NEPA required NPS to assess the
environmental impacts to the Steamtown National Historical Site.
However, the plaintiffs have not shown how any environmental
effects to Steamtown have a reasonably close causal relationship
to the decision to allow construction within the Parks.  To
trigger NEPA's requirement to assess areas beyond the boundaries
of the Parks, the plaintiffs must do more than show that the S-R
Line as a whole would have environmental effects on another area

of federal land.  Instead, the plaintiffs must show why the
agency action in this case, the decision to allow the S-R Line to
be built through the Parks, caused the environmental effects of
the S-R Line's construction elsewhere.  Whether the environmental
effects were on federal lands or non-federal lands, the issue is
whether the environmental effects were caused by the agency's
action.

Here, the plaintiffs simply assert that NPS knew what the
entire route of the S-R Line would be and that this knowledge
required NPS to assess the indirect effects of the S-R Line to
locations outside the Parks.  See Pls.' Reply at 37-38.  However,
the plaintiffs have not identified the reasonably close causal
relationship between the environmental effects that they have
identified, such as impacts to the viewshed of Steamtown, and the
decision to grant the permits for the expanded right-of-way and
construction in the Parks.  Thus, the plaintiffs have not shown
that the scope of NPS' analysis in the FEIS was arbitrary and
capricious.  Because the plaintiffs have not shown that the NPS'
actions violated NEPA, the plaintiffs' motion for summary
judgment on the NEPA claims will be denied and judgment will be
entered for the defendants on the NEPA claims.

II.  NPS ORGANIC ACT

The NPS Organic Act was implemented to "promote and regulate
the use of the Federal areas known as national parks, . . . which

purpose is to conserve the scenery and the natural and historic objects and the wild life therein . . . by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1.  The D.C. Circuit has recognized that "[b]ecause the Organic Act is silent as to the specifics of park management, the Secretary has especially broad discretion on how to implement his statutory mandate."  Davis v. Latschar, 202 F.3d 359, 365 (D.C. Cir. 2000).  However, the NPS Organic Act "prohibits uses which impair park resources and values."  Greater Yellowstone Coal. v. Kempthorne, 577 F. Supp. 2d 183, 194 (D.D.C. 2008).  "An impairment is an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources and values, including the opportunities that otherwise would be present for the enjoyment of those resources or values." Mainella, 459 F. Supp. 2d at 99 (internal quotation marks omitted); accord, NPS Management Policies § 1.4.5.  In reviewing an agency's action under the APA, the court must determine whether the agency "'articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  Mainella, 459 F. Supp. 2d at 90 (alteration in original) (quoting Alpharma, Inc. v. Leavitt, 460 F.3d 1, 6 (D.C. Cir. 2006)).  This standard requires NPS to provide a "specific and detailed explanation as to how it arrived at [its] conclusion[.]"  Bluewater Network v. Salazar, 721 F.

Supp. 2d 7, 30 (D.D.C. 2010).  In particular, "[m]erely

describing an impact and stating a conclusion of nonimpairment is

insufficient, for this merely sets forth 'the facts found' and

'the choice made,' without revealing the 'rational connection' --

the agency's rationale for finding that the impact described is

not an impairment."  Mainella, 459 F. Supp. 2d at 100.  "The

agency's decisions are entitled to a 'presumption of regularity,'

and although 'inquiry into the facts is to be searching and

careful, the ultimate standard of review is a narrow one.'"  Id.

(citation omitted) (quoting Citizens to Preserve Overton Park,

Inc. v. Volpe, 401 U.S. 402, 415-16 (1971)).

In Mainella, NPS' description of the environmental

consequences to park resources from directional drilling outside

of the national preserve used undefined conclusory labels such as

"negligible," "minor," "moderate," and "major" to describe the

adverse impacts from the drilling with "little or no explanation

of how NPS reached them."  Id.

> As NPS notes in each decision, "[w]hether an impact
> meets this [impairment] definition depends on the
> particular resources and values that would be affected;
> the severity, duration, and timing of the impact; the
> direct and indirect effects of the impact; and the
> cumulative effects of the impact in question and other
> impacts."  But it is just that assessment that is
> lacking here.  Any reasoned explanation must set forth
> which of those factors were significant in leading NPS
> to conclude that an impact is not an impairment -- or
> that a group of impacts collectively is not an
> impairment.

Id. (alterations in original) (citations omitted). Similarly, in Bluewater, NPS failed to identify a "logical link" between the description of the consequences of PWC emissions on water quality and NPS' non-impairment decision. Bluewater, 721 F. Supp. 2d at 30. In particular, NPS provided "little or no basis for understanding why an identified impact fails to rise to the level of an impairment." Id.

The plaintiffs argue that NPS' decision to grant the special use permits and expanded right of way violated the NPS Organic Act because NPS did not articulate the rational connection between the identified adverse environmental impacts arising from building the S-R line and the non-impairment determination. Pls.' Mem. at 28. In particular, the plaintiffs argue that NPS' Non-Impairment Determination ("NID")[8] shows that NPS' decision was arbitrary and capricious because NPS failed to 1) explain why adverse impacts did not result in impairment, 2) connect the impairment threshold to any objective standards, and 3) explain the inconsistences between restoration projections in the FEIS and the ROD. Id. at 28-33.

The plaintiffs cite the NID's rationale regarding impairment to the visual resources and rivers in the affected areas. Pls.'

_____

[8] The parties agree that the NID included in the Administrative Record is not the final version. Pls.' Mem. at 7 n.6; Intervenor Defs.' Mem. at 16 n.10; Federal Defs.' Mem. at 7 n.7. The final NID was included as an attachment to the federal defendants' motion for summary judgment.

Mem. at 28-30.  The NID's section on visual resources
acknowledges significant environmental impacts arising from the
S-R Line project.  The NID states that "[t]he selected
alternative will . . . result in unavoidable adverse impacts
because the larger transmission line structure will remain a
visible intrusion that degrades the existing scenic quality of
the area that it traverses."  Federal Defs.' Mem., Ex. A, NID at
12.  However, the NID explains that the S-R Line will be built
along the route of the existing transmission line and will
include measures to reduce the impact to the visual resources.
Id.  In particular, the NID states that the non-impairment
decision is based on the mitigating effects of placing tower
structures at the maximum feasible distance from roadway and
trail crossings, using non-reflective neutral colored painting,
using monopoles to replace the current lattice towers,
revegetating the disturbed areas, reducing the width of the
permanent cleared right-of-way, and "allowing areas not needed to
maintain the line to succeed to forest inside the [right-of-
way.]"  Id.  Unlike in Mainella and Bluewater, the NID in this
case does not simply identify the environmental impacts and
assert a non-impairment decision based on a conclusory label.
Instead, NPS provided specific reasons why the S-R Line project
would not impair the visual resources of the Parks.  Although NPS
could have included more detail assessing "the severity,

duration, and timing of the impact" to visual resources, the discussion in this case sets forth a rational explanation for the agency's actions.  Although the plaintiffs may disagree with the agency's conclusion regarding non-impairment, NPS has set forth "a rational connection between the facts found and the choice made" that the adverse environmental impacts on visual resources will not impair the Parks resources.

The plaintiffs also cite the NID's discussion of the adverse consequences to the Middle Delaware River.  The NID states that "[a]dverse impacts to visual qualities of the river will extend beyond the river itself" and "[t]he presence of taller towers, thicker and more numerous lines, and bird diverters will be seen not only as boaters pass below the wires, but as they approach from both upstream and downstream directions."  Id. at 13.  However, the NID refers to the explanation discussed above concerning visual resources as a partial basis for the non-impairment decision regarding the river resources of the Parks.  Id.  In addition, the NID refers to the explanations in the historic structures and archaeology sections of the NID.  Id.  Those sections describe specific mitigation measures to limit the adverse impacts to the resources in the Parks such as avoiding any archeological resources, halting construction where unknown resources are discovered and placing trees and vegetation between the historic resources and the transmission line.  Id. at 9-10.

The NID states that "[s]cientific resources, including water
quality, also will not be impaired because construction or
disturbance will not occur in the river nor within a 100-foot
buffer from the river's edge." Id. at 13. Overall, the NID
states that the line will cross the river at only one location
and that the access roads for the S-R Line construction will not
be visible from the river. Id. Thus, unlike in Bluewater and
Mainella, NPS has asserted a rational basis for why the adverse
impacts identified in the NID do not rise to the level of
impairment and provided a logical link between the description of
the impact and the non-impairment decision.

The plaintiffs further argue that NPS "failed to connect the
impairment threshold to 'any objective standards that have been
announced or evaluated.'" Pls.' Mem. at 28 (quoting Bluewater,
721 F. Supp. 2d at 33). Both Bluewater and Mainella support the
proposition that general descriptions of impacts or "unbounded
terms" that provide no objective standard for comparison are
insufficient to satisfy the requirements of the NPS Organic Act
under APA review. See Bluewater Network, 721 F. Supp. 2d at 33;
Mainella, 459 F. Supp. 2d at 101 ("An unbounded term cannot
suffice to support an agency's decision because it provides no
objective standard for determining what kind of differential
makes one impact more or less significant than another." (citing
Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco,

Firearms, & Explosives, 437 F.3d 75, 81 (D.C. Cir. 2006))).

Specifically, the plaintiffs challenge NPS' analysis in the

geological resources section that the project's adverse impacts

will not "'*substantially change* the scenic landscapes'" in the

parks.  Pls.' Mem. at 31 (quoting NID at 4).  However, NPS

explained that the basis for that conclusion was that the adverse

impacts to geological resources "will occur entirely within the

[right-of-way] corridor and will be limited to specific locations

where towers will be installed."  NID at 4.  Further, the NID

discussed the low probability of boreholes and the shallow nature

of the drilling.  Id. at 3-4.  Although the NID could have

provided more details regarding the geological consequences, the

NID asserted reasons for the conclusion and objective statements

about the extent of damage to the geological resources.

The plaintiffs also challenge the NID's discussion of

archeological impacts.  That section states that "'known

archeological sites will be avoided *for the most part* or the

effects will be limited to *just a portion of* the site[.]'"  Pls.'

Mem. at 31 (quoting NID at 10).  However, the archeological

resources portion of the FEIS states that a total of 25

archeological sites were identified along the alignment for the

alternative that was selected.  FEIS at 221 (AR 48082).  Then,

the NID specifies that two archeological sites could be affected

and discusses specific mitigation measures for project work near

archeological resources in the Parks including "avoid[ing] or
minimiz[ing] ground-disturbing activities to the most significant
portions of the site." NID at 9. NPS also referred to the
intended mitigation measures as described in Appendix F of the
FEIS. Id. NPS has provided a sufficient rationale as the basis
for the non-impairment determination because the non-impairment
determination is not built on undefined and conclusory terms as
happened in Bluewater and Mainella.

Plaintiffs contend that the NID is inconsistent with the
FEIS with respect to how long the disturbed areas of the Parks
would take to return to their original conditions. In
particular, the plaintiffs assert that the NID states that
disturbed areas will "'succeed to forest over time[,]'" but the
FEIS states that these areas, including mature forests and
wetlands, may not return to the previous condition. Pls.' Mem.
at 31-32 (quoting NID at 6-9). However, the NID is consistent
with the FEIS because both documents reflect that certain
disturbed areas would not be able to recover fully after
construction. Specifically, the NID concedes in each section
cited by the plaintiffs that cleared areas within the right-of-
way will result in permanent losses to vegetation, but that areas
outside of the right-of-way and areas within the right-of-way
that are not required for the operation of the S-R Line (such as
the access roads and tower foundations) will be "allowed to

succeed to forested area over time." See NID at 6. The NID states that the cleared areas in this project will be allowed to recover, but the NID does not contradict the FEIS because the NID does not claim that any mature forest will be restored to its original state within the 15-year period that the FEIS analyzed. See NID at 6; FEIS at 411 (AR 48272). Further, the NID states that compensatory mitigation will restore impacted wetlands at a minimum acreage of 1 to 1 and that the project does not entail the conversion of wetland to non-wetland. NID at 5. Thus, NPS' non-impairment decision will be upheld because the plaintiffs have not shown that NPS acted arbitrarily and capriciously in concluding that the S-R Line project will not result in impairment of the Parks' resources and values.

Plaintiffs further argue that NPS did not provide a reasoned analysis for the approval of the special use permits and expanded right of way for the S-R Line in light of the significant adverse environmental impacts which would result from the construction. Pls.' Mem. at 33-37. In particular, plaintiffs argue that the ROD reflects that the agency based the decision to reject the no action alternative on "speculation[] about potential litigation" and that the agency was incorrect in its legal assessment. Id. at 34.

An agency's decision may be rationally based on legal advice and analysis regarding contractual or easement matters. See

Daingerfield Island Protective Soc'y v. Babbitt, 823 F. Supp.
950, 956-57 (D.D.C. 1993). In Daingerfield, the district court
reviewed the NPS' decision to approve an interchange design. Id.
at 953. The government had entered into a Land Exchange
Agreement that granted a developer an easement to build an
exchange that would have access to the George Washington Memorial
Parkway. Id. at 952. NPS assessed the potential interchange
designs and considered recommending that no interchange be built,
but NPS was advised by counsel that the Land Exchange Agreement
required that the interchange be built and that "the only choice
left to NPS was to approve the least intrusive interchange
possible, which it did, or to refuse to approve any interchange
at all, which would have violated the Exchange Agreement that it
had been informed was legally binding on the federal government."
Id. at 956. The plaintiffs challenged NPS' decision arguing that
no interchange should have been built based on environmental
concerns. Id. The district court explained that "[w]here
several administrative solutions exist for a problem, courts will
uphold any one with a rational basis, so long as the balancing of
competing solutions is not an arbitrary one." Id. Because the
administrative record in Daingerfield reflected that NPS had
evaluated the options and decided on the least intrusive design
alternative, the NPS' decision was upheld and the district
court's decision and rationale was affirmed by the D.C. Circuit.

Daingerfield Island Protective Soc'y v. Babbitt, 40 F.3d 442, 446
(D.C. Cir. 1994).

In this case, the feasibility of the no-action alternative
lies at the center of this dispute.  The ROD explains that the no
action alternative was not feasible because the utilities
companies own a property interest in the existing right-of-way,
upon which they could build a new line within the current right-
of-way without NPS approval.  ROD at 18.  The plaintiffs contest
the utilities companies' rights under the easements and argue
that the utilities companies were required to gain NPS approval
even if they attempted to build the transmission line without an
expanded right-of-way.  Specifically, the plaintiffs contend that
NPS has the authority to prohibit the utilities companies from
building the S-R Line within the existing right-of-way.  The
plaintiffs state that the utilities companies may not use their
easement in a way that would create a "high risk of fire" caused
by insufficient clearance between the proposed S-R Line and the
trees around the right-of-way.  Pls.' Mem. at 34-35.  This legal
dispute remains unresolved.[9]

---

[9]  The essence of the dispute is whether the utilities
companies' easements include the right to cut down and remove
trees outside of the right-of-way on either side of the easement.
The plaintiffs argue that the utilities companies do not have the
right to remove trees outside of the right-of-way.  Thus, the
utilities companies cannot safely construct the new S-R Line
within the existing right-of-way and NPS approval is required for
any attempt to build the S-R Line within the existing right-of-
way.  Pl.'s Reply at 22-23.  If true, that conclusion would

The question presented here is not whether the utilities
companies could have built the S-R Line within the current right-
of-way without NPS approval.  Instead, the narrow question
presented here is whether NPS made a rational decision that the
no action alternative was not feasible and that an alternative
option was preferred.  Faced with "significant uncertainty" and a
"strong probability" that the outcome -- either the unilateral
building of the new transmission line within the intervenor-
defendants' right-of-way or future litigation regarding the
easements and a potential takings claim -- would be "worse for
park resources than the selected alternative[,]" NPS decided that
the no action alternative was not feasible.  ROD at 18.  Much
like in Daingerfield, NPS recognized that the best alternative
for the environment was the no action alternative.  However, NPS
considered in reaching its decision the legal analysis regarding
whether the utilities companies could build the S-R Line without
approval and the utilities companies' statements that they
intended to build the line without NPS approval.  Id.; see AR

---

undermine NPS' decision to reject the no action alternative.
However, the utilities companies counter that the easements
expressly release the utilities companies from any liability from
trimming or cutting down trees that interfere with the
transmission lines.  Intervenor Defs.' Mem. at 26-28.  Thus, the
utilities companies argue that they can clear vegetation on
either side of the easement and avoid any risk of fire and can
safely build the S-R Line without NPS approval.  Intervenor
Defs.' Reply at 3-7.  Further, the utilities companies state they
have removed trees near the transmission line as recently as
2010.  Id. at 5 n.3 (citing AR 77470).

28475-77; 77432-33.  NPS decided that the "least intrusive"
option would be the best alternative.  While plaintiffs argue
that the NPS' authority over the utilities companies' use of the
easements is uncontroversial, this property dispute paired with
the strong likelihood that the utilities companies would seek to
continue construction of the transmission line, provided a
rational basis for NPS to reject the no action alternative.  The
plaintiffs have not shown that NPS' decision was arbitrary and
capricious and the defendants are entitled to summary judgment on
the NPS Organic Act claim.

III. WILD AND SCENIC RIVERS ACT

        The WSRA was implemented to protect and preserve the values
of designated rivers in the United States.  See 16 U.S.C. § 1271.
The WSRA states that each component of the wild and scenic rivers
system "shall be administered in such manner as to protect and
enhance the values which caused it to be included in said system
without . . . limiting other uses that do not substantially
interfere with public use and enjoyment of these values."  16
U.S.C. § 1281(a).  Additionally, the WSRA provides that

        no department or agency of the United States shall
        assist by loan, grant, license, or otherwise in the
        construction of any water resources project that would
        have a direct and adverse effect on the values for
        which such river was established . . . .  Nothing
        contained in the foregoing sentence, however, shall
        preclude licensing of, or assistance to, developments
        below or above a wild, scenic or recreational river
        area . . . which will not invade the area or
        unreasonably diminish the scenic, recreational, and

> fish and wildlife values present in the area on the
> date of designation of a river as a component of the
> National Wild and Scenic Rivers System.

16 U.S.C. § 1278(a). The WSRA provides three classifications for

rivers in the system: scenic, recreational and wild. See 16

U.S.C. § 1273(b). The portion of the river which the S-R Line

will cross is designated as scenic. See Publication of

Classification Map for the Middle Delaware River, 45 Fed. Reg.

3396 (Jan. 17, 1980).

The plaintiffs allege that NPS' decision to grant the

permits and the expanded right-of-way was arbitrary and

capricious because the NPS did not give "primary emphasis" to

protecting the river, Compl. ¶ 102 (citing 16 U.S.C. § 1281(a)),

and because the project qualified as a water resources project

that would have a "direct and adverse effect on the values for

which such river was established," Compl. ¶ 105 (quoting 16

U.S.C. § 1278(a). The plaintiffs argue that the record reflects

that the project violates the WSRA because construction would

substantially interfere with the public use and enjoyment of the

rivers. Pls.' Mem. at 37-38. The defendants counter that,

although the NPS acknowledged that the S-R Line will have some

negative effects on the river's scenic values, the S-R Line

creates no substantial interference because most of the river

view will remain unchanged and the NPS required measures to

mitigate the detrimental impacts to riparian areas. See

Intervenor Defs.' Mem. at 38; Federal Defs.' Mem. at 23-24
(citing ROD at 13 (AR 116599)).

In general, an agency's assessment about whether an action
substantially interferes with public use and enjoyment of the
river's values is entitled to deference.  See Rivers Unlimited v.
U.S. Dep't of Transp., 533 F. Supp. 2d 1, 5 (D.D.C. 2008); Hells
Canyon Alliance v. U.S. Forest Serv., 227 F.3d 1170, 1178 (9th
Cir. 2000).  Furthermore, "the mere existence of some decline in
scenic value does not establish . . . substantial[]
interfere[nce.]"  Hells Canyon Alliance, 227 F.3d at 1178.  In
evaluating whether new construction or modifications would create
a substantial interference, an agency may consider the existing
structures and uses of a river, including those that pre-date the
river's protection under the WSRA.  See Rivers Unlimited, 533 F.
Supp. 2d at 5.

In this case, NPS acknowledged that "[t]he presence of the
taller towers, thicker and more numerous lines, and bird
diverters" will have an adverse impact upon visitors in the
Parks.  ROD at 13 (AR 116599).  The FEIS discusses the adverse
impacts resulting from the construction of the S-R Line in
further detail as well.  See, e.g., FEIS at 695-96 (AR 48556-57)
(considering the potential detrimental impacts of new
construction on the river's scenic value).  However, the NPS
provided a reasonable basis for finding that the S-R Line will

not violate the WSRA by substantially interfering with the visual quality of the river.  The S-R Line will cross the river at the same place as the existing B-K Line does and the agency referred to the visual resources section which cited the use of neutral colored paints to reduce reflection and the use of monopoles rather than lattice towers as factors underlying their decision. NID at 12-13.  The NPS considered the extent to which the new towers and access roads would be visible within the Appalachain National Scenic Trail and the Delaware Water Gap National Recreation Area, identified the potential negative effects of the S-R Line and discussed measures to lessen its visual impact.  Id. at 12-13.  The agency's consideration of potentially adverse consequences to public use and enjoyment of the river and its identification of methods to mitigate and avoid such effects demonstrate that its decision was not arbitrary and capricious. See Hells Canyon Alliance, 227 F.3d at 1178-79; Rivers Unlimited, 533 F. Supp. 2d at 5.  The agency therefore rationally determined that the S-R Line does not substantially interfere with the visual quality of the river.

While the plaintiffs may disagree with NPS' conclusion, they have not carried their burden of showing that the agency's decision was arbitrary or capricious.  Thus, the plaintiffs' motion for summary judgment on the WSRA claims will be denied and

the defendants' cross-motion for summary judgment will be
granted.

## CONCLUSION

The plaintiffs have not shown that NPS' decisions in this
case were arbitrary and capricious.  The defendants have shown
that the agency's decision is rationally based on the
administrative record.  NPS' actions will be upheld under each
statute, the plaintiffs' motion for summary judgment will be
denied and the defendants' cross-motions for summary judgment
will be granted.  An appropriate Order accompanies this
memorandum opinion.

SIGNED this 30th day of August, 2013.


_____/s/_____
RICHARD W. ROBERTS
Chief Judge